Good morning. I'm James Laughlin and I represent the appellant John Nance. I would like to reserve two minutes of my time for rebuttal. I will do that. This morning I'd like to talk about whether Mr. Nance's five-year sentence is reasonable. Possession of child pornography is a serious offense and it deserves to be punished. That's not in dispute. The question is what's the reasonable punishment for this offense. Reasonableness comes from proportionality. The sentence has to fit both the crime and the offender. But as the Second Circuit recently recognized in Dorby, the applicable guidelines, section 2G2.2, suffers from serious flaws that make it fundamentally different from most guidelines and that can easily lead to sentences that are unreasonable given all the 3553A factors. And for the Court's information, and I just discovered this yesterday afternoon, the Second Circuit issued an amended decision in Dorby just two days ago. And it appears they did it to make the decision stronger, not weaker. In particular, what they did is they added a citation to the Troy Stabenow article, which is attached to Mr. Nance's opening brief. And it also added a quotation from a former New York U.S. attorney. Did you provide this to us? Excuse me? Did you provide a 20-AJ notice? It was late yesterday afternoon. I apologize, Your Honor. I will file one. Is the answer to my question no? Correct. It's no. And did you bring copies with you to court this morning? Yes. Not for the Court, Your Honor. Did you provide a opposing counsel with? No, Your Honor. And I apologize for not doing that. I figured the decision itself is, based on the previously filed 20-AJ letters, the Court is informed of that. Well, then why don't you keep your discussion to what you filed? If you thought it was important, you should have notified the opposing counsel and brought copies to court. You know about electronic filing? I do, Your Honor. You're familiar with it? I am. You could have done it yesterday, right? Correct, Your Honor. But you didn't. No, I didn't. Was it a surprise as well? Not at all, Your Honor. And I apologize again for not doing it. I didn't think it was necessary, given the Court was already aware of the Dorby decision. But I will certainly, in the future, make sure I don't make that mistake again. I have a question because the government's 20-AJ letter says that the government filed a petition for rehearing en banc in Dorby. So are you trying to tell us Dorby was amended in response to that petition? I don't know. I tried to check the docket. So we don't know whether the second circuit is acting on it? I don't believe that it's a ruling based on the petition for rehearing. It was certainly filed after the petition for rehearing was filed. There was a notice filed at the same time, but because second circuit PACER documents are not available for viewing, I was not able to determine what that, at least on our system, we were not able to determine what that was. I anticipate that the government's PFR in that case is still pending. So, anyway, I will go on. And regardless of the amendments to the Dorby decision, the Dorby decision does strongly provide an argument for why Section 2G2.2 is not a reliable guideline and why district courts should be very, very careful in applying that guideline because it can so easily result in an error. Well, counsel, when you say it's not a reliable guideline, and correct me if I'm in error, but I understand you to be saying, consistent with some of the authorities you rely on, that most of the guidelines were an attempt to average out sentences over the breadth of the United States before the guidelines were published. In other words, the commission made an effort to find out what sentences were being imposed for various offenses and then average them out. And so the contention is that Congress did not utilize that but, in fact, imposed standards of its own. Now, as I understand the argument, because Congress decided they wanted to impose a different sentence than the average sentences previously imposed, we should simply disregard what Congress said and attempt on our own to come up with some average? No, Your Honor. Unfortunately, I don't think that the courts, separate from the Sentencing Commission, has what the Sentencing Commission has, which is the ability to compile data and look at nationwide sentencing schemes and figure out what just punishments may be. The problem with the congressional interference is it skewed that system away from the commission's traditional role. Under the system set forth in Booker, the first step does have to be calculating the guidelines correctly, and that includes using all the enhancements that were congressionally mandated. What we're talking about here is the second step of the process. The court doesn't have to follow that guideline. Are you saying the court didn't recognize that it wasn't required to follow all the enhancements under that guideline? I think it's unclear on this record whether the court did fully appreciate the argument. It certainly understood that it could go below the guideline range because it did, apparently, for other factors. I'm not sure that it fully understood the argument dealing with the historical problems with the guideline because it never addressed them explicitly. Are you arguing that the court is required to explicitly address the argument that you made about the guideline being unreliable? I don't think in this situation the court has to reach that. I think that would certainly be the best practice, but the point that I'm trying to make is we're asking the court to review Mr. Nance's sentence for substantive reasonableness. And I don't think that this court can do that without taking the first step of deciding how valuable the guideline range is, because just as a district court does, part of the And I don't think that it's appropriate. In some of the cases, the government, aside from other circuits, just say, well, you know, the district court was free to disregard this, so it's not even an issue for us. I think that's incorrect. I think what the Second Circuit did was correct. To determine whether something is substantively reasonable under 2G2.2, you first have to recognize the fundamental flaws in 2G2.2. And that in particular, I think, is why the Second Circuit reached the decision it did. You know, it went through, just as I did in our brief, the typical scenario. In that case, it was a distribution rather than possession of child pornography, and added up all of the enhancements that apply, and it went through the statistics in 97 percent of the cases, or in 92 percent of the cases. And recognize that you quickly get to a base offense level that's effectively 30. And by way of comparison, you know, if after this argument, Mr. Herzog and I go out in the hall and have a big fight, and I get so angry, and at a fit of rage, I kill him, my offense level for voluntary manslaughter would be 29, which is below both what Mr. Nance and what... Well, counsel, you're not disputing that if Congress had decided for reasons meaningful to you, that child pornography would be exempted entirely from the guidelines, and that anyone convicted of child pornography would get a 20-year sentence just automatically. You're not suggesting that subject to Eighth Amendment analysis, that that wouldn't be within Congress's prerogative, would it? Your Honor, there's nothing I know of that would make that illegal. I would hate to offer an opinion without thinking it through more fully and maybe doing some research on that. But as long as there is the guideline system, however, the discretion is ultimately left with the district court. And the problem we have with what the Congress has done by interfering with the Sentencing Commission is that this guideline in particular is no longer a valid, useful tool for sentencing, because it no longer represents all of those data collection practices and policy things that the commission puts into effect to make the guidelines as reliable as we hope they can be. Counsel, one of the problems posed to Apprendi and Booker is that the U.S. Supreme Court has said that if the legislature attempts to create factors that will modify a maximum sentence, defining the maximum sentence as some kind of average sentence, that has to be a jury decision. And Justice Breyer, writing for a 5-4 majority, said that you can get around constitutional problems by making the guidelines advisory and allowing the district judge in his or her discretion to vary a guideline sentence. One of the problems I have with arguments like you're making is you seem to want to substitute an appellate panel for the legislature and come up with some rules of general application governing sentencing. And I'm wondering if that in and of itself wouldn't create constitutional problems. Well, Your Honor, I don't think I'm asking the Court to do that. In fact, I don't think I'm asking this Court to do anything that the Supreme Court didn't do in Kimbrough with regard to cracked sentences or that the Dorby, the Second Circuit didn't do in Dorby with regard to this guideline, TG 2.2. And that is, recognizing that the guidelines are advisory, it's still important that the guidelines have to be reliable. And when they aren't, it's incumbent upon the appellate courts, if the district courts are not understanding it, to explain, as the Second Circuit did, you know, here's why this guideline has a lot of problems. And it's the last paragraph of that decision was encouraging all the district judges within that circuit to carefully apply this guideline because it can lead to such unfair sentences. Well, don't you want to argue, I mean, see, I don't think we need to decide whether Congress enacted, you know, whether somehow the guideline was unduly interfered with with Congress. I think that's probably Congress's prerogative. But, I mean, this is supposed to be individualized sentencing. Don't you want to, I mean, I don't see how, for example, where the district courts, expressly took into account his age, the nature of the offense, possession versus distribution, for example. I mean, I guess the way I would, rather than ask us to say, you know, Congress cannot do this, you're asking for more than I think you need to ask for in this case for your client. I guess that's my point. Well, I certainly agree with Your Honor that the facts of this case, you know, Mr., and I'm running out of time if you'd like to answer the question. In the facts of this case, you know, Mr. Nance is 70 years old, suffers from a stroke. We've put him in a trailer that he lived in, thought it was a place to die, bankrupt and alone. And I think that a five-year sentence before this guideline got to the range where the starting point was 78 sentences, 78 months, would have been viewed as completely unreasonable. So I do agree that the facts of this case alone justify a lower sentence, but I think it's particular. What lower sentence? I think it's flexible. I mean, it was, probation was asked for at the district court level, and it wasn't granted. I think it could have been validly granted under this court's decision in auctiory. But at this point, my client has served about 14 months in jail. So by the time this court renders a decision, it'll probably be a few more months. And so you're talking about something in the range of an 18- to 20-month sentence. I would hope that if the case makes it back to the district court, something in that ballpark or not much higher than that would be a reasonable sentence. In other words, you want the decision in this case to be something to the effect that, taking into account the totality of the circumstances and the list of them, the maximum sentence that could be imposed is within a range of 18 to 21 months? I'm not asking for that. The Court hasn't done that in any of the other cases where it has reversed it for substantive reasonableness. I think that's up to the Court. If the Court thinks guidance like that would be the best way to convey how it views the case to the district court, then the Court might want to do that. I think the alternative is to do what the Second Circuit did, which is kind of lay out all the problems it had with the sentence, including the fact that the problems it saw with 2G2.2, and then just remand for sentencing consistent with the opinion. Always, of course, would the defendant have the option to reappeal if the sentence remained unreasonable. I'm way over my time, so unless the Court has further questions, I'll sit down. We'll hear from the government. David Herzog, United States, Maine Pleas the Court. After Kimbrough, the district court has discretion to vary from the guidelines based on a policy disagreement, but there's no law that says the district court must. And in essence, that's what the defense is asking for. Actually, I think what he's saying is that there's nothing in the record that even indicates that the Court considered that argument and rejected it, or even recognized that it had the ability to disagree as a policy matter with Congress in this particular case. I mean, you have to acknowledge that several courts have had lots of issues with this particular guideline as applied to possession. Yes, I do acknowledge that, Your Honor. But the court didn't seem to be in the record that the court acknowledged that. If I could direct the Court's attention to pages 57 of the excerpt of record. At the beginning of the sentencing hearing, the district court, on page 35 of the excerpt of record, noted that it had read all the papers, including the defendant's position papers, which did make this argument. At the sentencing hearing, the defendant did not argue the substantial reasonableness based on the staff in the article. But at the end of the sentencing hearing, when the court made its decision to impose the sentence, the court, as you noted, Judge Wardlaw, ticked through the age of the defendant, the seriousness of the crime, the fact that, and this is on page 56 of the record, the fact that you're just looking really doesn't mitigate it. It's like a peeping Tom going and looking in people's windows. It doesn't hurt anybody. I'm just looking. But it really does. You do have victims, and in this case you know multiple victims, because that's thousands of shots here. And then on the next page, on 57, the court, having analyzed the 3553A factors and having read the papers of the defense, which included this argument, said, the kinds of sentences available, the age of the defendant is a factor, one of the factors, the need to avoid sentences and disparities among defendants with similar records that are found guilty of similar conduct in this court and how it's sentenced in the past. And I think this is the critical part. All those factors of 3553, I think that if they're taking the guidelines into consideration, but not having those dictate what it is, what would the court indicate the sentence would be? And then the court imposed a sentence 18 months beneath the low end of the guidelines. So here, the district court, having read the papers that made this argument, determined the proper procedural guidelines range of 78 to 97 months, and then not having the guidelines dictate what it is, the court imposed a sentence of 60 months, because the court, looking at all the factors, believed that that was the appropriate sentence for this defendant with this conduct. But if you don't agree with the calculation that results from the guidelines, dropping down 18 months is not indicating disagreement. It's accepting it and then dropping down. I think you're right. And had the court expressed the kind of concern about 2G2 that other courts have, including Dorvey and the other district courts from across the country that the defendant cites, then I think we'd be in a different position. But the fact that Judge Klausner here, the district court, did not address, did not in any way articulate that kind of concern with the guidelines after having read and received the argument, I think does indicate that he was not as concerned about 2G2 from his position as a district judge. So what's happening in the central district? Are different judges applying this guideline differently? I mean, is it arbitrary which judge you get, whether it's going to be a judge that listens to the arguments or doesn't? That's a difficult question for me to answer, Your Honor. I think you're right. You do get different sentences, particularly marriage, child pornography, possession cases, depending on which judge you draw, and I think anybody would acknowledge that. But in this case, based on these facts, this judge... Are those differences driven by the existence of these enhancements? Do they all happen in all cases? I mean, there were a series of factors here that kicked up the sentencing range, right? Yes, I think Your Honor's right. My district election from the one or two cases, child pornography cases I had in district court here, they don't all have those factors. I think that's right. The typical child pornography case follows the pattern here, which is that the guidelines range is 78 to 97 months based on the same enhancements applying in most of the cases, sadism, masochism, children under a certain age, number of images. Is that because if you download a thousand images, you're going to get a repertoire that includes all of those types of things? I think that's probably true, but I think that's also based on the defendant's conduct, because when you do searches on LimeWire, as in this case, or other search engines where you look for child pornography, you do receive images that meet those characteristics that trigger the enhancements. Explain that to me, because I didn't really understand. So the search on LimeWire, you would have to specifically articulate a certain type of image to receive that image? I don't quite understand how it works. Yes, I think that's right. In this case, the defendant said that the word he used was teens, and obviously because a 19-year-old is above the age of majority, that would not necessarily implicate child pornography. But my understanding is that in the world of the LimeWire searches, there are trigger words that you can put in in order to obtain images of child pornography. And to be fair, with the advent of the Internet, it's just the nature of this medium that if you put in certain words indicating that you're looking for sexual conduct of children, or images of children naked, or there are code words for that, if you put those words in, you will get back a lot of pictures and a lot of images, and many of those will trigger the enhancements. But I just want to note for the Court, in this case, one of the enhancements that ratchets up the sentence is the number of images. And it's true that a video under the guidelines counts for 75 still images. But this defendant had thousands of images. This is not a defendant who had 10 videos only, and that is what made the number so high. This is a defendant who downloaded and received and possessed a very large number of images of child pornography. But I would say this as well. Part of the reason that those enhancements tend to apply in many, many child pornography cases is that the government uses its resources to prosecute the cases where people are doing the most egregious conduct. And to the extent that having a lot of images, having particularly violent images or sadistic and masochistic images, to the extent that that conduct is more egregious, the government uses its resources to go after those defendants. And I think that's one of the reasons why. I think Judge Wardlaw, of course, speaks eloquently for herself. But I understood her to be asking, for those of us who are not familiar with LimeWire, not familiar with its search engine, but are familiar with Google, a person who is seeking child pornography and utilizing LimeWire, does the evidence show if he or she set out to search for sadomasochistic activity, if they set out to search for sexual intercourse with two-year-olds, things like that? Thank you. Am I understanding the court's question correctly? Is it an accident? Is that the question, that could you put in search terms that appear to be neutral or that you as a person entering the terms appear to be neutral to you and then you get back a flood of child pornography? Is that the question? Yes. Okay. It is certainly the case that that could happen, and that even happens with Google, that you type something into Google and you get back a bunch of content that you did not expect to get or anticipate. In this case, and in many child pornography possession cases, the responses to the search terms are in coded language, such that in the world of people who possess child pornography, you can look at the name of the file and figure out that that's child pornography. So I don't have a very clean answer for the court on whether or not... Okay. But following up on the answer you did give, it's my understanding that this gentleman was located because agents monitoring LimeWire and were able to trace to a computer to which Mr. Neal was able to access certain images. So they have some kind of record of what images were downloaded. Now, was an effort made in analyzing these various enhancements before the trial judge to key in on evidence that would trigger a desire to meet the various enhancements? Or is it just a fact that they went through Mr. Nance's collection and found... It's the latter, Your Honor, particularly because it's a possession crime. And on some level, I don't know, and the record doesn't reflect the extent to which Judge Klosner was analyzing this, but one thing that indicates it's not an accident is how many images there are. Because if a person who is not seeking child pornography were to put words into LimeWire and start to get child pornography, a person not seeking child pornography would stop, presumably. But if your LimeWire account continues to be receiving child pornography after you enter search terms, it's likely that you're actually seeking the child pornography such that when you possess it, that's intentional and not an accident. But the phrase child pornography covers a multiplicity of images. And I think one of the concerns is images that enhance or enhance a crime or offense and kick up the guideline. To what extent can, would it be possible to develop a guideline or a rule that would more carefully guard how these enhancements are found? I think the fear is that everybody who does it at all is going to be maxed up to the top because the various enhancements themselves are so common. Right. I think I agree with the Court. That's the concern. I think that's a concern that's reflected in many of the cases that the defendant cites. I think it's also the case that when agents go to, in this case, would it be go to the trailer after looking at what images are coming across the wire, they will, if it appears that there's a, I'm sorry. If it appears that it is the case that a couple of images have gone and it doesn't look like somebody's really trying to get this stuff, I do believe that the agents would either stop or pull back the investigation on that person. I think there's a big difference just factually between someone who... So if somebody is downloading basically adult porn and they go through the images and they find, I guess the agents know some of the images to be of children because they're well-known, right? Right. And they go through and they find 600 images and two of them wind up being known below 18, which are representing to us, you know, at that point they probably wouldn't prosecute, they wouldn't, they would close the investigation based on that. I believe that to be the case, Your Honor. And I think that the defense that you often get when these cases go to trial is, look, I did have a lot of adult pornography, First Amendment-protected adult pornography on my computer, and I also had some child pornography that came through because some of the searches did that. And I think that's quite a legitimate defense that it is possible that it could be an accident. But in cases like this where there's so many thousands... Let's talk about the other enhancements. The one for the number of images, that's a choice, right? How many images you download. There's nothing about the nature of the search that says you've got to download a thousand images or nothing. That's right. They don't come in blocks. I think that's right, Your Honor. Right. I mean, you select how many images you actually download. Yes. When you put in a search term, my understanding of the way it works is that you put in a search term and a number of potential hits come up, and then you click on the ones that you want to download. So yes, every time you do that, you're making a choice as to how many you get. But just to follow up on that, are you getting a file that could have ten images or a hundred images? Just to follow up, my concern is, is someone really accountable for the conduct that gets an enhancement? So if you download a term and you get a bunch of things, do you know how many images are in the file you're opening? Because of the nature of the way this stuff is produced, it's impossible to answer that question yes or no. You will get video files. You will get image files, so photographs. And I believe you can also get a file that has a number of photographs in it, each of which is its own image. But do you know what you're doing when you're downloading that? Unquestionably. When you put in search terms, preteen, sex, the coded language for child pornography, if you put those terms in and the LimeWire kicks back to you, potential files for you to download, it's certainly true that the file name might not match the image that's actually in the file, but when you click on it, you are clicking on, it seems quite clear that you're clicking on something you believe to be child pornography. And you're accountable, I think you are accountable for that image. But files that contain more than one image just look different. There's zip files usually, right? Yes. There are compressed files that are zipped up together. Otherwise, it would indicate a JPEG file or a BMP file or something of that sort, each of which would be a single image. I think the court's correct. I think that's right. My understanding is if you download the zip file, then you might not know how much is in there. In fact, it may just be one giant single picture, but it's more likely that you've got a bunch of images that are all compressed together. I think that's right. I think the court's right about that. And you can tell sometimes from the file extension, whether it is .jpeg or .zip or .wma or whatever the extension is, it might give you some indication as to what you're actually getting. But in any event, regardless of what's inside there, when you click on that, after entering a child pornography search term, you certainly know or anticipate that what you're going to get back is an image of child pornography. And it's also true that in one of those enormous files, it might just be one really long video, which would only count for 75 images because it's only one video. So in this case, how many images were found? More than 1,000. The record is more than 1,000. How do the agents become aware of these searches on LimeWire? They monitor the file names that go out over LimeWire. Is LimeWire exclusively pornography? No, I think it's also music and movies, non-pornographic movies. Pornography is copyright infringement, right? Yes. It can all be done through LimeWire, Your Honor. It's not like a Google search engine. To be fair to LimeWire, it is merely a conduit, and it can be used for people to share family photos or music that they produce themselves. It's entirely possible to use for that purpose. Yes, Your Honor, it is entirely possible. I'm not sure to what extent it ever is, but I truly don't know to what extent it ever is, but it's a tool. It is for file sharing, regardless of the content of the file. The way I understand it works is much like what's described in our NAFTA case, right? Exactly, Your Honor. It's the same principle. What it does is it connects people's peer-to-peer individual computers. It keeps track of... I mean, let's say you were to sign up for LimeWire, which I am reasonably confident you're not. You would then be providing access to the world to either the entire computer or a particular folder on your hard drive, and then people could go through and, like in a library, pick what files to get, right? I think that's exactly right, Your Honor. And you could do that with your mother in sharing family photos. I mean, there are other means of doing that, probably easier than LimeWire, but it's certainly capable of that. Or perhaps even industrial uses where you have large files where one office has a large file and one's attached to another office. It could be done, right? Yes, I think the Court's absolutely right. But it is widely used for illegitimate purposes. Yes, in particular child pornography, because of the mechanism the Court has just described. It is a person on one computer able to access the files in another person's computer to the extent that the person that has child pornography and wants to get it out into the world has it on his or her computer, LimeWire is a particularly good tool for going to get that and put it back on your computer. So when the agents find someone like Mr. Nance who's downloaded, I assume he's paid for this. He's paid for the service. I believe you pay a fee to LimeWire. I don't think you pay for the images. I don't think you pay the peer that you're taking images from. Can the agents then trace from Mr. Nance's to where the images came from? How do they ultimately get to the creators and distributors of the pornography? When the agents monitor and find images of child pornography going to a certain IP address, which is one computer, they can tell with certainty that at least that computer has received these images. I believe there's a mechanism for going into the LimeWire system, my guess is that it would be a subpoena of LimeWire's records, to find out what IP address the image came from. Another concern I have is the whole purpose of the guidelines is uniformity and sentencing. You're telling me that even the judges in the Central District and perhaps all over the country are applying this differently based on policy disagreements. That's kind of a concern. I'm wondering, does your office have guidelines or internal prosecutorial guidelines that would dictate what kind of sentence your office would seek in a particular child porn case? Yes, we do. In the general run of cases, absent something extraordinary, we would seek the low end of the guidelines, based on whatever enhancements are appropriate to that defendant. Now, in almost all possession of child pornography cases, the guidelines range is 78 to 97 months, and the government seeks 78. In this case, that's what happened. Judge Klausman went 18 months below that. You know, I'm sort of harking back to my experience in the District Court, but I remember having a case not so many years ago. It's published, it's called Hill. I'm sure your office must be aware of it. And that case is closed and gone, so I'm not... But as I recall, the sentencing range was something like 38 months, and it was very much the same situation. There were about a thousand images, and fortunately, I never... There was no trial. I was not required to see the images. But the sentencing range seemed much lesser. This was about five years ago. Have things changed significantly since then? Are these enhancements... Is something bumped up in the last few years? Yes. I believe that... I don't know the actual answer to this, but I believe that's right, that the guidelines... Well, I assume this was five years ago. Yes. I do think one of the factors that is a significant determination of where the sentencing range is going to be is actually the nature of the images. I apologize for having to be so graphic, but if there are images of penetrative sex with a child, for example, under the age of five, that is, by definition, under a case called Reardon, sadism, masochism, you get an uptick for that. You get an enhancement for that. If your case, if Hill... If, for example, the actual images didn't have that particular feature, the range might be significantly lower. So it does depend on the images. I've blacked out most of the details, but that might not have... As I said, I never had to look at this stuff, so I... But it may not have... I don't remember it being brought to my attention that that wasn't a feature. I see. So that is something that is not present in every case. That's correct. And I would say this perhaps will help people understand what happens in between the change of plea and the sentencing here is that the agents sit down with the probation officer and the images and show an image or some images that will trigger the enhancements. So if, for example, the government seeks, because the images are appropriate, if the government seeks the sadism, masochism enhancement because it's that type of conduct, the probation officer has to look at the image and the agent goes and shows it to the probation officer so that it comes back in the PSR. If that doesn't... If there is no such image, then that enhancement doesn't apply and the government doesn't seek it. But it is often the case that with the child pornography on these defendants' hard drives  there often are those kinds of images that do warrant the enhancements for that kind of conduct. So you've got a thousand images, that number, that's not unusual at all. Not at all. Although it is volitional. You don't have to download a thousand images. There is the sadomasochism or violence enhancement. There is the very young person enhancement, which is separate. Which is under the age of what? I believe it's 12. I will say this, there is usually the use of a computer enhancement, which does apply in almost every case, if not every case. It doesn't necessarily have to because you could go to a swap meet and possess a magazine. You could go buy a magazine on child pornography or have a magazine sent to you from another place in the world that you possess that you did not use the computer for. But in the modern day and age, and in certainly every case, every child pornography case that I have done, that enhancement always applies. But that is just the nature of living in the modern age and the computer being the way people obtain their information, family photos and child pornography, which is through the computer. So I mean, I share Congress's concern with stamping out child pornography. I mean, it's obviously more than a very serious crime. It's a grave crime. I'm still concerned about the five years of jail time being given to a 70-year-old disabled person with 20 years of supervised release. I mean, we know since we've sentenced that everybody by rote says, oh, I read all the papers and considered everything. And maybe they have, maybe they haven't. I mean, the only way we know whether they have is if they say something about it. And so specifically about it. And I mean, it's just I'm wondering if the five years was really the appropriate sentence or whether, you know, how close to unreasonable it would be given this particular defendant to hold up in his trailer. I mean, it seems to have nine FBI agents to send on him. I'm sensitive to the Court's concerns. I would just direct the Court to pages 56 and 57 of the excerpt of the record, where I think Judge Klausner does a pretty good job of articulating the reasons he believes 60 months is the right sentence for this defendant. And he does take into account, he specifically takes into account the defendant's age. But that's offset by the seriousness of the offense. And that, at least based on this record, is what the District Court was really focusing on. And I'd also just, of course, note to the Court that the question is not with this Court sitting as a sentencing court, but did this judge abuse his discretion. And based on that part of the record, pages 56 and 57 of the excerpt of the record, Judge Klausner does take into account the age of the defendant and his health, but also the seriousness of the crime and the number of victims. You know, he says you do have victims, in this case, multiple victims here because there's thousands of shots, videos, and photographs. He says the offense is very serious. The characteristics of the defendant are somewhat neutral as far as he does not have any background, any offenses in his past. The Court did note that he did not see a fear of the defendant getting involved with acts against minors, but that he believes that the victimization occurred in the viewing of the images, that you don't have to touch a kid for this to be a problem, which is what the defense argued at sentencing. So I think, yes, in a perfect world. I mean, it's quite clear that Judge Klausner was aware of, I mean, thought about this. There's no doubt about it. I think that's right, Your Honor. And for that reason, it's not, he did not abuse his discretion in sentencing 18 months beneath the low end of the guidelines, even for this defendant who was 70 and had a high stroke. Thank you. I know I went well over my time. If I could ask for a minute just to address some of the questions. In particular, I want to just, the Court asked a lot of questions about these enhancements and how often they're applied. I don't have the statistics for this circuit, this district in particular, but I'd point to the Dorby, the original Dorby decision at page 96, where it says using fiscal 2009 information for 2G 2.2, it says that 94.8% involved images of prepubescent minors, so that's a plus 2. 97.2 involved a computer, that's another plus 2. 73.4 involved an image depicting sadistic or masochistic conduct qualifying for the 4-level enhancement. And 63.1 involved 600 or more images qualifying for the 5-level enhancement. And a higher number, 96.6%, had at least a 2-level number of images enhancement. So hopefully that can give the Court some guidance about how often these are applied and truly the base defense level... Certainly the number of images is volitional. I mean, you could have somebody who says, gee, I'm sort of curious. I mean, it would be highly illegal to do it, but just like some people might say, gee, I'm curious about smoking pot, and they try it once and then don't, they might download a couple of images, look at them, and still be legal, but it's quite different from having over 1,000 images, as your client did. And the fact that a lot of other people do it maybe just means that more serious sentences are appropriate to deter others, no? Well, I disagree with that last comment, Your Honor. I think that particularly when we're talking about people like Mr. Nantz, first-time offenders, first-time offenders at the age of 70, I don't think a five-year or sometimes like the guideline range would have been six-and-a-half years. That's the kind of sentence that deters him or future offenders any more than a shorter but definite period of time. So I'm not disputing that a sentence is important to deter the conduct. I just don't think that sentences as high... Well, there's also no need to download masochistic pictures, right? That's a choice. Well, Your Honor, I guess I would... I mean, the computer's a little different because I think people just don't go to swap these much to find sharp pornography. I think it's... So, you know, I have a little number that was 97%. My guess is 97% is a low number in terms of how often computers are involved. But all the other stuff just strikes me as being choices that the defendants make. Well, with regard to the sadistic images adjustment, I think that that is not necessarily the case because that condition has been interpreted so broadly that it encompasses any kind of penetration. And as disturbing as that is, that is child pornography. When people start gathering these images... But there is sharp pornography and there's sharp pornography. You could have pictures of naked children displaying their private areas, and that's sharp pornography as well. Having a small child, a child and a small child, penetrated by an adult, I don't know. I think it's a different class in terms of the harm that's being caused. I mean, both are very bad. And just as we sometimes look at capital murder, and we say all murders are bad, but some are worse, it seems to me that one can rationally say that taking photographs of naked children is an evil that's different in kind from taking children and having sexual intercourse with them and penetrating them. I don't see any... I don't disagree with that point. I don't disagree that comparing those two things, obviously the second is worse than the first. What I'm saying is, and again, if the court looks at the history of the child pornography guideline, originally the sadistic conduct enhancement was only applied to producers. The commission thought that the producers who create these acts for then publication are the ones who should get that enhancement. Congress then later on said, well, as it was adding on everything it could, it added a nondestructive possession. And then, of course, the courts have interpreted it much broader than its plain language, because there certainly are images that would constitute traditional sadism with bondage and horrible things like that. But the definition did get expanded, and that's why there's such a large number. I don't think that this large number reflects the number of people who are consciously going out specifically looking for that kind of thing. But having listened to this argument, it sounds like your client was. Well, I don't agree with that either, and that's the other point I wanted to make to Chief Judge Kaczynski's question, which is the number of images, and in this case there isn't anything in the record detailing his history about how he, there's nothing about the printer cache about when they were downloaded, how they were downloaded. But just generally, both with LimeWire and to the extent images were found by websites, it doesn't take long, and a lot of the cases that have called into question 2G2.2 have recognized this. Given the Internet, it does not take long to compile a whole bunch of images. It's not the same kind of volitional act as it used to be if somebody was in the pre-computer days going out and compiling a whole stack of child pornography images. It really is a click, and sometimes a click can be a whole page that has 40 or 50 thumbnail images, and then if those are on the computer and they count as 50 images, the defendant may not have even looked at them. So it's really easy to get that number up, up, up, and I don't think it's a good metric for the relative culpability of possession defendants in that regard. But does LimeWire keep a record available to subpoena of images transferred peer-to-peer? Your Honor, I don't know that. I know very little about how LimeWire works. My understanding, though, is LimeWire is software that two individual users would have on their computers that allow those computers to communicate. And LimeWire servers, such as if you're going through AOL and you're sending emails in that regard, in which they do keep records like that. In this case, was this a situation where the government learned that a particular person was utilizing LimeWire to transfer pictures back and forth, got a hold of his records, and then traced these specific images to the people next door to Mr. Nance? Is this some kind of a sting? Yeah. What's in the record is vague about how the investigation started, but they did say that they were able to determine that LimeWire was used to download certain images to a certain IP address, and that was the IP address registered to Mr. Nance's neighbor, Mr. Freeze. They go to search his house, and he says, Well, I shared this with two other people, including Mr. Nance, and Mr. Nance is the one you want. So that's how the investigation made it to him. I mean, usually what they do is they identify a server. They identify somebody who has images to serve, and what they do is they see who taps into him, and then they eventually get us the guy who's serving up the images, but often they will just watch it. I suspect that's how they do it, but maybe those are secret techniques that law enforcement agents don't wish people to know how they do it. Well, they simply didn't give that information to us. You see what's been troubling us, and we've had this long discussion. I mean, the idea that you've got these enhancements, and do they really necessarily apply to everybody, so that what winds up being a crime that is nominally punished fairly low, you know, reasonably, always gets kicked out. You know, you end up to something much higher, and that's why I've sort of been exploring this. But I personally am not convinced that that is the case, that for most of those enhancements, there aren't volitional choices made by a defendant. I realize it's easy, and maybe easy is tempting, but just as one can stop drinking or smoking or taking drugs, maybe taking drugs is more difficult than drinking. One can't put a stop to this, right? Well, I think that the statistics from the Dorby decision and also some statistics from the Choice Statement article, I think, do reflect and answer Your Honor's question that these enhancements are applied in the vast majority of the cases. And although I disagree somewhat with your classification of them as showing some significant increase in culpability for the defendants for all of those applications, even if that's the case, what you have is, if it's applied to most, the vast majority of the possession defendants, then the de facto base sentencing range, base sentencing offense level, is 30. And I think that when you think about reasonableness, you then have to compare that to, you know, the base offense level for, you know, sexual abuse of an adult woman, which is 30, voluntary manslaughter, which is 29, aggravated assault, which is 14. And I think that's the problem these courts are having with it. It's like, it's recognizing that, as Judge Warloff said, this is a grave crime, it's a really serious crime, it needs to be dealt with seriously, but things have gotten off the track, and we need to try to figure out what reasonable sentences can... You know, it's hard to say, because some of the other crimes you've mentioned, which involve sort of things in the physical world, if people commit assault or rape or, you know, things of that sort, they sort of know they're doing wrong, or they are aware that, you know. Whereas I think people sitting there, trailers, downloading these things, somehow in their minds think, oh, I'm, I think it's what Judge Claus has said, you know, I'm really not doing anything wrong, I'm really not... You know, it may be illegal, but there's no victim involved. And the reality is that there are victims involved, and maybe their lesson is that we need to punish this more severely, because there seems to be this effect that the people who do it think they're harming anybody, and it's just easy to click and download. Well, I disagree with that, Your Honor. I think that is the attitude that a lot of people have. That's why we have a lot of first-time offenders who end up with this offense. But I don't think they're saying that, you know, if I was going to get a two-year sentence for this, I'd keep doing it, but if I knew I was going to get an eight-year sentence, I'd stop doing it. The problem is that it's not clicking with them that they know they could be punished. And that's why I think punishment is important in these cases. But a reasonable punishment on a first-time offender of a couple of years that was publicized and made so the general public knew, hey, this is the consequences you are going to face, I don't think there'd be many people out there, to the extent we're talking about people who are making rational decisions based on potential punishment. The two-year punishment serves as much of a deterrent effect as the greater punishment, because I think anybody who would say I'm going to keep doing it because if I can get two years but not if I can get eight years isn't really going to make a rational decision no matter what the punishment is. Maybe eight years isn't enough. Maybe we need to be looking at 25 or 40. I'm not saying we should. Maybe what you're arguing, the consequence of that is that we really ought to make things really, really bad so that the difference between two and 40 really causes people to think twice. Well, only in the sense that then that would apply across the sentencing scheme for every offense, because we have crimes committed all the time despite the consequences being high sentences, and the remedy outside of the child pornography context has not always been let's make it higher and higher and higher and higher and higher. Well, counsel, assuming for the moment, and I'm not predicting this, but assuming for the moment that the panel wanted to reverse or wanted to grant your client some relief, what principle could the court articulate as a guide? In other words, as a poor lowly trial judge, the worst thing I could get from an appellate court would be, you're wrong, try again, with the understanding that we're playing with a yo-yo. It's going to go back and forth until somehow the appellate court loses interest in the case. So what principle would guide a trial court in arriving at an appropriate sentence in this case? I think something similar to what the Second Circuit did in Dorby would be appropriate, where they conducted an extensive analysis of 2G2.2, pointed out its flaws and its potentials. What did Dorby say to the trial court on remand? It said, District judges are encouraged to take seriously the broad discretion they possess in fashioning sentences under 2G2.2, ones that can range from noncustodial sentences to the statutory maximum, bearing in mind they are dealing with an eccentric guideline of highly unusual providence, which, unless carefully applied, can easily generate unreasonable results. Who is the panel? Judges Cabranes, B.D. Parker, and Underhill. There was no dissent. I guess I have one other question. I don't have a record of this, but this was a conditional plea agreement. Yes. Government has to prove that the images are of real children. Correct? Correct. I'm wondering.  That's my recollection, yes. I didn't hear your answer. I said that's what my recollection is, yes. So he agreed that he knew that he was watching abuse of real children. Yes. I can't remember exactly what his factual basis is, but he did acknowledge in his factual basis it possessed at least one image of a real minor engaged in sexual activities defined by the statute that defines child pornography. Do you know the answer? I do. I can point to the court's factual basis. 261 is the factual basis of the plea agreement where the defendant admitted that the image that he possessed, at least one image, was sufficient. Did you say 261? 261, Your Honor. At the time the defendant possessed two images of child pornography, the defendant admitted that the image he possessed was sufficient for a minor engaged in sexual activity. I'm sorry, which lines are you reading from? Lines 13 to 16. Thank you. Anything further? Well, I just will say I'm sympathetic to this argument about the application of 2G. I'm not sure that I would think it is applicable in this case. So it might be an argument worth pursuing in other cases, even if we don't happen to fall in favor of your client on this case. Well, I would point out, and this is in answer to Judge Singleton's question as well, that an alternative basis would be to remand it to the court, because it didn't expressly deal with this argument, and maybe now in light of Dorvey and the other cases and a direction from this court to expressly consider that argument, that may benefit Mr. Nance. And if that's what the court can do, we would certainly appreciate that. Thank you. Your Honor, might I just put up a record site that I think will help Judge Singleton on what happened to get the files? Please. If the court turns to excerpt of record pages 95 through 97, it is the process by which the agents obtain the file. It's how they monitor the website for the files. And the court can also see there the titles that were in the shared folder. And as you can see from the titles of those, it's such things as Child Lover, Medley of Scenes, Underage Girls, Children, Preteen Lolita. It's coded language. So I think if the court just takes a look at those three pages, you'll see the process there. And what is this document that disappears from? That is the affidavit in support of the search warrant that was originally executed at the neighbor's house, at Friese's house. And this is paragraph 11? Yes, paragraph 11, Your Honor, and then through to paragraph 14. Through 14? Yes, 11 through 14. So it ends at page 17, page 120. There are three numbers here. Sorry, Your Honor, yes. Page number 98, page 17 of the affidavit. Yes, Your Honor, and that 98 is extracurricular 98. We have it. Thank you. Thank you very much. Thank you, counsel. We've held you for a very long time. This was very helpful. It's all very troubling. And as you can tell, we've given a lot of thought to this case, and we'll continue to do so. And counsel has been very helpful. We appreciate that. The case is argued. We'll stand submitted. Last case on the calendar, United States v. Ortega-Castellanos.
judges: Singleton, Kozinski, Wardlaw